UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HWANG, PH. D.,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL TECHNOLOGY AND ENGINEERING SOLUTIONS OF SANDIA, LLC,<br><br>Defendant. | Case No. 20-cv-08551-SK<br><br>**ORDER REGARDING MOTION FOR SUMMARY JUDGMENT**<br><br>Regarding Docket No. 107 |

This matter comes before the Court upon consideration of the motion for summary judgment filed by Defendant National Technology and Engineering Solutions of Sandia ("Defendant"). Having carefully considered the parties' papers, relevant legal authority, and the record in the case, and having had the benefit of oral argument, the Court hereby grants Defendant's motion for the reasons set forth below. The Court overrules Defendant's evidentiary objections to the extent the Court considered such evidence in ruling on the motion for summary judgment, with the exception to Defendants' objections to the Declaration of Rebecca Perry, as discussed in detail below.

**BACKGROUND**

Plaintiff Robert Hwang, Ph. D. ("Plaintiff") alleges that Defendant discriminated against him based on race and national origin when he was employed by Defendant. Plaintiff was born in Macau, which later became part of the People's Republic of China, and he is Asian. (Dkt. No. 1 (Complaint, ¶51).) Plaintiff later became a United States Citizen. (Dkt. No. 111 (Declaration of Robert Hwang, Ph.D.), ¶ 2.) Plaintiff began working at Sandia National Laboratories ("Sandia"), a federal research and development laboratory, under contract with the U.S. Department of Energy's National Nuclear Security Administration ("NNSA"), on October 15, 1991, and became

the Director of Center 8300 starting in 2013. (*Id*., ¶ 7.) Defendant has managed and operated Sandia since May 2017. (*Id*. ¶ 8.)

**A.      Doris Ellis' Supervision of Plaintiff.**

Before Doris Ellis became Plaintiff's supervisor, Plaintiff received pay raises, promotions, and above satisfactory performance evaluations. (*Id*., ¶ 7.) Plaintiff received raises and bonuses every year except for fiscal year 2019. (*Id*., ¶ 32.) He typically received $30,000 as a bonus each year. (*Id*.)

In a memo dated June 27, 2019 ("June 2019 Memorandum"), Ellis, then Plaintiff's supervisor, explained her concerns regarding Plaintiff's performance:

> Your job as a leader and manager of managers is to assure that your managers and senior managers are competent to do their jobs, and then to hold them accountable to execute their work professionally as they manage day-to-day. You also have a responsibility to be available and professional in engaging with mission enabling personnel, as well as expecting your managers to engage professionally with them. You have received direct feedback that your Sr. Managers are not behaving professionally and have not acted on that information in an effective way. In a recent interaction with your ISD professional, your HRBP, and others, I have been told that you engaged in a less-than professional way when a deliverable did not meet your expectations. That behavior on your part, is not something that your managers should want to emulate. […[¶] …]
>
> l know from our discussion that you believe that the issues are mischaracterized. Regardless of your perception, these issues have been identified by people with whom you interact and should be taken seriously. While each incident may be explained away, as a pattern of behavior, it is not possible to ignore. As we discussed, your impact may not be the same as your intent and there must be sustained improvement in these areas. If you want to continue to be a director, you need to take these leadership and management responsibilities to heart.

(Dkt. No. 107-4 (Exhibit C to Declaration of Doris Ellis ("Ellis Decl.")).) The June 2019 Memorandum listed particular issues for Plaintiff's improvement: (1) his failure to attend management meetings; (2) his abdication of his management duties; (3) his unprofessional interactions and his senior managers' unprofessional interactions with staff; and (4) his management approach, including micro-managing, being autocratic, and providing unclear direction. (*Id*.)

Plaintiff believed that Ellis failed to provide him with specifics and guidance on how to

1 address her concerns. (Dkt. No. 111, ¶¶ 14, 15.) Plaintiff also disputes the validity of some of
2 those concerns. (*Id*. ¶¶ 17, 19.) Plaintiff further states that he complied with all of the directives
3 but that Ellis was never satisfied with his performance. (*Id*., ¶¶ 19, 21, 23.)

4 On June 25, 2019, Ellis asked Plaintiff if he would consider taking a position as Senior
5 Scientist, an independent contributor role, rather than continue as Director of Center 8300. (Dkt.
6 No. 107-3 (Ellis Decl.), ¶ 9.) Plaintiff rejected the offer. (*Id*.)

**B.     September 2019 EEO Investigation of Plaintiff.**

8 In early July 2019, Plaintiff began reporting to Dr. Andrew McIlroy, who became the
9 acting Associate Lab Director. (Dkt. No. 111, ¶ 16.)

10 On July 30, 2019, Patricia Taylor, a business manager in Center 8100, complained that
11 Plaintiff discriminated against her and harassed her based on her gender and that Plaintiff, along
12 with his subordinates, Sarah Allendorf and Chris Moen, "created an aggressive and intimidating
13 work environment." (Dkt. No. 107-11 (Declaration of Germaine Almager-Laughlin ("Almager-
14 Laughlin Decl.")), ¶ 2.) Taylor asked Defendant to investigate her complaint. (*Id*.)

15 Germaine Almager-Laughlin and Diane Cunningham, on behalf of Defendant, conducted
16 the investigation into Taylor's complaint. (*Id*., ¶ 3; Dkt. No. 107-12 (Exhibit A to Almager-
17 Laughlin Decl.).)

18 Plaintiff contends that the investigation showed that he did not yell at Taylor and that all of
19 the witnesses stated that they never witnessed any unprofessional behavior by Plaintiff. (Dkt. No.
20 111, ¶ 35; *see also* Dkt. No. 107-12 ("all interviewees state that they have never witnessed any
21 yelling or unprofessional behaviors in the workplace by Mr. Huang, Ms. Allendorf or Mr.
22 Moen.").) Nevertheless, the investigation summary also stated that witnesses made the following
23 complaints about Plaintiff:

24 > [t]here is not a lot of interaction with the staff; disengaged with the California site; travels to Albuquerque frequently where his home and family are located; not a strong leader; unclear communications; constantly is asking for more information without clear direction; hands-off leadership style; heavily relies on his senior managers for guidance, support and decisions; delegates managing of the center to senior managers; cancels meetings at the last moment without regard for other people's time; appears dismissive when he is paying more attention to his phone (email/text); over-management of one group

3

>due to his passion for the work, which can give the perception that he does not trust the management team.

(Dkt. No. 107-12.)

## C. Plaintiff's October 2019 Performance Evaluation.

In October 2019, Plaintiff received his Oct. 2018 – Sept. 2019 year-end evaluation. (Dkt. No. 107-2 (Deposition of Robert Hwang, Ph.D. ("Hwang Depo."), Vol. III attached as Exhibit H to Declaration of Jeff Polsky ("Polsky Decl.")) at 220:10-24.) The performance evaluation stated:

> Overall [Plaintiff's] performance does not meet expectations for a Director.
>
> [Plaintiff's] strength lies in building technical programs and interacting with sponsors. . . . .
>
> However, [Plaintiff's] leadership of 8300 has not met expectations. A Center Director is expected to lead and inspire his employees. . . . In June, Dori[s] Ellis met with [Plaintiff] and followed up with a memo to [Plaintiff] outlining four areas for improvement: lack of attendance at Division meetings, abdicating Director management duties, unprofessional behavior by [Plaintiff] and his Senior Managers with Mission Enabling staff, and management approach (micro-manager, autocratic, unclear direction). In August, an ethics complaint was filed against [Plaintiff] and two of his Senior Managers. Although the complaint was unsubstantiated, the resulting investigation found:
>
> - Lack of engagement with staff
> - Disengagement with the CA site
> - Unclear communication
> - Constantly asking for more information without clear direction
> - Hands-off leadership with reliance on the Senior Managers for guidance and support
> - Appears dismissive when paying more attention to his phone
> - Over management of one group due to his passion for the work
>
> These are similar issues to those raised in a 2016 ethics investigation and noted in a Memo of Expectations from Marianne Walck, dated November 7, 2016. In that memo Marianne writes "you are perceived by some as lacking respect and support for subordinates and non-technical support professionals. Individuals report a lack of communication or poor communication that leaves them with unclear expectations and a feeling that you are dismissive of ideas, and their work products." [*sic*] . . . . [N]ow the issues raised three years earlier

4

> have resurfaced despite working with a coach over that period to address them. Also troubling is that similar behaviors are now being noted in two of his senior managers [Sarah Allendorf and Chris Moen] as documented in the [Taylor] investigation report, suggesting that these traits have become normalized in the Center.

(Dkt. No. 107-2, Ex. 109 to Ex. F (Huang Depo., Vol. I).) In this performance evaluation, Plaintiff received a "below expectations" rating on his standard goal to "perform day-to-day requirements of the job as defined by [his] job description and level." (*Id*.) The standard goal is the foundation of each employee's job and carries the most weight. (Dkt. No. 107-2, Ex. K (Deposition of Defendant's Rule 30(b)(6) Witness) at 31:4-8.) Plaintiff received a "9" rating, which is a poor rating and the lowest an employee can receive in an evaluation. Plaintiff received this rating because he performed below expectations on the standard goal, which was the core of his job. (Dkt. No. 107-2, Ex. 109 to Ex. F and Ex. J (Deposition of Andrew McIlroy) at 133:4-8; 134:10-12, 18-135:3.)

Plaintiff believed that receiving this 9 rating meant that he would not receive any raise or bonus for that year. (Dkt. No. 111, ¶ 32.)

**D.     Plaintiff's Performance Expectation Plan.**

On December 16, 2019, Plaintiff was placed on a Performance Expectation Plan ("PEP"). (Dkt. No. 110 (Exhibit 18 to Declaration of J. Edward Hollington ("Hollington Decl.")).) The PEP stated that in June, Ellis had met with Plaintiff and outlined four areas for improvement outlined above: (1) his failure to attend management meetings; (2) his abdication of his management duties; (3) his unprofessional interactions and his senior managers' unprofessional interactions with staff; and (4) his management approach, including micro-managing, being autocratic, and providing unclear direction. (*Id*.) The PEP further noted the August 2019 findings from the investigation of the ethics complaint outlined above against Plaintiff: (1) lack of engagement with staff; (2) disengagement with the California site; (3) unclear communication; (4) constantly requests for more information without clear direction; (5) hands-off leadership with reliance on the Senior Managers for guidance and support; (6) appearance of being dismissive when paying more attention to his phone; and (7) over-management of one group due to his passion for the work. (*Id*.) The PEP identified the "expectations that must be met and sustained"

5

1   by Plaintiff:

2   - Attend all Division level meetings and Labs meeting[s].

3   - Be personally responsible for all Director duties and not abdicate these duties to your Senior Managers.

4

5   - Behave professionally with all managers and employees and require the same of your Senior Managers.

6   - Improve management approach.

7   (*Id*.)  Plaintiff was given a memo entitled "Decision Making Leave for Performance Improvement

8   Requirement or Separation Option" ("Decision-Making Memo").  (Dkt. No. 110 (Exhibit 20 to

9   Hollington Decl.).)  The Decision-Making Memo presented Plaintiff with three options: (a) enter

10   into and complete a performance improvement plan within 60 days; (b) resign without a

11   possibility of re-hire; or (c) seek review of the decision by the corporate review committee.  (*Id*.)

12   Plaintiff was provided a day off work to consider these options and was required to notify

13   Defendant of his choice by no later than December 18, 2019.  (*Id*.)  If Plaintiff desired to pursue

14   option (a), he was required to submit a written action plan on December 18, 2019.  (*Id*.)

15   Plaintiff was concerned that he would be fired after sixty days if he selected option (a) and

16   was concerned that he would lose his retirement benefits as a result.  (Dkt. No. 111, ¶ 29.)  He

17   believed, from his experience, that the corporate review committee would not vote to overturn,

18   change, or modify any of the executive-level managers' decisions and that he would have been

19   terminated if he selected option (c).  (*Id*.)  Plaintiff tried to obtain answers to his questions

20   regarding his selection and the effects on his retirement benefits, but he could not get answers

21   before a decision was required.  (*Id.*, ¶ 30.)  Plaintiff thought his best option to maintain his

22   retirement benefits was to select option (b), so he scratched out the word "resign" and

23   "resignation" and wrote in the word "retirement." (*Id*.)

24   Plaintiff elected option (b), to resign without a possibility of re-hire, with the substitution

25   in wording noted above.  (Dkt. No. 107-2, Ex. 114 to Ex. G (Hwang Depo., Vol. II).)  Plaintiff

26   notified Defendant of his selection of this option on December 17, 2019.  (Dkt. No. 107-2, Ex. 115

27   to Ex. G.)  He stated:

28

> After careful consideration, I have decided to announce my retirement. I have had 28 wonderful years at Sandia and been fortunate to have been a part of many exciting and impactful programs. However, it is time for me to move on to other things.
>
> I have been blessed to work with outstanding folks and I will miss them.
>
> With your support, my hope is to make Jan 7, 2020 my last day in the office to ensure a smooth transition. I would like to then be able to take my vacation until approximately March 12, 2020.

(*Id*.) McIlroy accepted Plaintiff's request to retire. (Dkt. No. 107-5 (Declaration of Andrew McIlroy ("McIlroy Decl.")), ¶ 7.)

### E.   Plaintiff's Request to Rescind His Retirement.

Plaintiff later learned that he would not forfeit any of his retirement benefits if his employment was terminated. (Dkt. No. 111, ¶ 33.) After accepting Plaintiff's decision to retire, McIlroy learned from human resources that starting on January 21, 2020, that Plaintiff began to inquire about changing his retirement date. (Dkt. No. 107-5, ¶ 9.) McIlroy did not object if Plaintiff wanted to adjust his retirement effective date by several days. (*Id*.)

On January 29, 2020, Plaintiff emailed McIlroy, Ellis, and James Peery an "action plan" ("Action Plan"), purporting to be what was required under the Decision-Making Memo if Plaintiff had selected option (a). (Dkt. No. 107-5, ¶ 10; Dkt. No. 107-6 (Exhibit B to McIlroy Decl.); Dkt. No. 107-2, Ex. 117 to Ex. G (Huang Depo. Vol II Transcript).) McIlroy responded that Plaintiff could not, at that point select option (a):

> Sandia has accepted your retirement notice, which you provided in lieu of participating in a Performance Expectations Plan, and you have already been on terminal leave for over three weeks. Additionally, the Plan you have outlined is over a month late and it does not address the specific leadership deficiencies identified in the Performance Expectations Plan. We have an acting 8300 Director in place and have posted the 8300 Director position and are well on our way in the staffing process to identify your permanent replacement.

(Dkt. No. 107-5, ¶ 12; Dkt. No. 107-6, Ex. C.)

### F.   Plaintiff's Accusation of Discrimination.

Also on January 29, 2020, Plaintiff's counsel emailed Ellis and Sandia's other senior leaders a copy of Plaintiff's EEOC charge, claiming that Defendant discriminated against Plaintiff on the basis of his race and national origin. (Dkt. No 107-3, ¶ 15; Dkt. No. 107-4, Ex. D; Dkt. No.

7

107-5, ¶ 13.)

## ANALYSIS

Plaintiff brings claims for discrimination based on his race and national origin under Title VII, 42 U.S.C. §2000(e) *et seq.* and California's Fair Employment and Housing Act, California Government Code §12940, retaliation in violation of 42 U.S.C. §2000(e)(3) and California Government Code §12940.  (Dkt. No. 1.)

**A.     Applicable Legal Standard on Motion for Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if it may affect the outcome of the case.  *Id.* at 248.  If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, set forth specific facts showing that there is a genuine issue for trial.  *Nissan Fire & Marine*, 210 F.3d at 1102.  In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes

1    summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In addition, the party
2    seeking to establish a genuine issue of material fact must take care to adequately point a court to
3    the evidence precluding summary judgment because a court is "not required to comb the record to
4    find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified*
5    *School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted). If the non-moving party fails
6    to point to evidence precluding summary judgment, the moving party is entitled to judgment as a
7    matter of law. *Celotex*, 477 U.S. at 323.

**B.    Defendant's Motion for Summary Judgment.**

   **1.    Plaintiff's Employment Discrimination Claims.**

To establish a prima facie case of discrimination, a plaintiff must show that: "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Chuang v. Univ. of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000); *Guz v. Bechtel National, Inc.,* 24 Cal. 4th 317, 354 (2000) ("Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes.") The fourth element can be alleged either through direct evidence of discrimination, such as a supervisor's derogatory comment about her race or gender, *see, e.g., E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1050 (9th Cir. 2009), or through circumstantial evidence, which may include allegations that similarly situated individuals outside the plaintiff's protected class were treated more favorably or that other circumstances surrounding the at-issue employment action give rise to an inference of discrimination. *See Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105-06 (9th Cir. 2008); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010).

With regard to the third element, whether an employee has suffered an "adverse employment action," courts have founds that an adverse employment action "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Chuang*, 225 F.3d at 1126. Adverse employment actions include "assigning more, or more burdensome, work responsibilities" as well as "termination, demotion, failing to promote, denial of an available job,

9

1  adverse job assignments, official discipline, and significant changes in compensation or benefits."
2  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008).

3  In his opposition to Defendant's motion for summary judgment, Plaintiff asserts the
4  following adverse employment actions: (1) poor rating on this 2019 performance review; (2)
5  termination and/or constructive termination; and (3) failure to rescind termination/his retirement.

### i. Low Rating on Plaintiff's 2019 Performance Evaluation.

Courts have held that "mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action." *Akers v. County of San Diego*, 95 Cal. App. 4th 1441, 1457 (2002) (interpreting FEHA and citing federal appellate opinions interpreting Title VII); *see also Hardin v. Wal-Mart Stores, Inc.*, 604 F. App'x 545, 548 (9th Cir. 2015) (negative review was not an adverse employment action absent facts that it was subsequently used to substantially and materially change the terms and conditions of employment); *Bryant v. Covina-Valley Unified Sch. Dist.*, 2017 WL 10543559, at *5 (C.D. Cal. Oct. 16, 2017) ("various courts have recognized that a negative performance review, without more, does not constitute an adverse employment action."); *Brown v. City & Cnty. of San Francisco Dep't of Pub. Health*, 2014 WL 6482059, at *7 (N.D. Cal. Nov. 18, 2014); *Yoon v. Kaiser Found. Hosp.*, 2009 WL 10680859, at *6 (C.D. Cal. Apr. 21, 2009).

Some cases have described "undeserved negative performance reviews" as adverse employment actions, *see*, *e.g.*, *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000), but such authority arose in the context of *retaliation* claims under Title VII, which define adverse actions more broadly and do not limit them to workplace-related or employment-related acts and harm. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006). Adverse action for purposes of a Title VII *retaliation* claim requires a showing that "a reasonable employee would have found the challenged action materially adverse," meaning "it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). In contrast, *discrimination* claims under Title VII require a showing that an action "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Chuang*, 225 F.3d at 1126.

10

The negative performance review in 2019 did not constitute an adverse employment action. In October 2019, Plaintiff received his Oct. 2018 – Sept. 2019 year-end evaluation. (Dkt. No. 107-2 at 220:10-24.) It stated that, despite his technical proficiency as a scientist, Plaintiff's "leadership of 8300 has not met expectations," and there were growing concerns that his continuing poor management was becoming "normalized" in Center 8300:

> [N]ow the issues raised three years earlier have resurfaced despite working with a coach over that period to address them. Also troubling is that similar behaviors are now being noted in two of his senior managers [Allendorf and Moen] as documented in the [Taylor] investigation report, suggesting that these traits have become normalized in the Center.

(Dkt. No. 107-2, Ex. 109 to Ex. F.) Plaintiff received a "below expectations" rating on his standard goal to "perform day-to-day requirements of the job as defined by [his] job description and level." (*Id*.) The standard goal is the foundation of each employee's job and carries most weight. (Dkt. No. 107-2, Ex. K at 31:4-8.)

Plaintiff argues that the low rating in this performance evaluation prevented him from receiving a bonus of approximately $30,000, but he fails to provide sufficient evidence to support this contention. At most, Plaintiff states generally that he received pay raises, promotions and bonuses in the past (Dkt. No. 111, ¶¶ 7, 32) and points to deposition testimony from Kim Edson, senior manager of business operation and human resources, who states that the low rating would affect Plaintiff's qualifications for bonus-type compensation. (Dkt. No. 121-1, Ex. 16 (Deposition of Kim Edson) at 6:24-7:2, 71:1-5.) Generally speaking, an employee has no entitlement to any bonus. *Rochlis v. Walt Disney Co.*, 19 Cal. App. 4th 201, 213-14 (1993) ("promises to pay salary increases or bonuses which are 'appropriate' to [plaintiff's] responsibilities and performance . . .are not capable of enforcement in a court of law"), disapproved on other grounds by *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238 (1994). Plaintiff here fails to provide any evidence to show that he was entitled to a bonus, such as evidence demonstrating: (1) what Defendant's requirements were to obtain a bonus that year; (2) that Plaintiff satisfied those requirements; or (3) that other Center Directors received bonuses that year and in what amounts. In fact, Plaintiff proffers no evidence that Defendant offered any bonus to anyone in that year or that the bonuses

11

1    were not discretionary.  Therefore, Plaintiff fails to provide evidence sufficient to show that

2    Plaintiff suffered an adverse employment action through this low rating.

3                          **ii.**        **Termination/Constructive Termination.**

4            In opposition to Defendant's motion for summary judgment, Plaintiff argues that

5    Defendant admitted that it terminated his employment or that Plaintiff was constructively

6    discharged.  Plaintiff points to the following statement in Defendant's motion for summary

7    judgment: "The ongoing complaints about Plaintiff's management deficiencies constitute a

8    legitimate, nondiscriminatory reason to terminate his employment." (Dkt. No. 107 at p. 20.)  This

9    statement does not constitute an admission of constructive discharge, as Defendant merely argued

10   that it had a legitimate basis to end Plaintiff's employment but did not argue that it actually

11   terminated Plaintiff's employment.  Defendant did not admit that it terminated Plaintiff's

12   employment.

13           Alternatively, Plaintiff argues that, although he retired, Defendant's actions equaled

14   constructive discharge.  However, Plaintiff failed to allege a claim or supporting facts to state a

15   claim for constructive termination in his Complaint.  (Dkt. No. 1.)  At most, Plaintiff raised the

16   issue of constructive termination in his statement of legal issues in his portion of the parties' joint

17   case management statement.  (Dkt. No. 20 at p. 4.)  Plaintiff, in his section of the joint case

18   management statements, included constructive discharge as one of the principal issues in dispute:

19-22
> Was NTESS' issuance of a performance improvement plan and threats to terminate Dr. Hwang along with pressure by Ellis and McIlroy for him to step down as Center Director adverse action, and was Dr. Hwang's experiences and knowledge of SNL's disciplinary process, and statements and conduct of Ellis and McIlroy sufficient for constructive discharge when Dr. Hwang announced his retirement on December 17th to be effective March 12, 2020?

23   (Dkt. No. 20 at p. 4; Dkt. No. 55 at p. 4; Dkt. No. 64 at p. 5; Dkt. No. 84 at p. 5; Dkt. No. 102 at p.

24   5.)  Plaintiff cannot assert this new legal theory for the first time in his opposition to the motion

25   for summary judgment.  *Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014) ("a

26   plaintiff cannot raise a new theory for the first time in opposition to summary judgment") (citing

27   *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir.2000) (plaintiff could not proceed

28   with new theory not pled in complaint); *Wasco Products, Inc. v. Southwall Techs., Inc.* 435 F.3d

12

989 (9th Cir. 2006)); *see also Gonzales v. City of Martinez*, 638 F. Supp. 2d 1147, 1162 (N.D. Cal. 2009) (granting summary judgment against claim asserted only in case management statement and not in complaint).

Even assuming, *arguendo*, that Plaintiff did sufficiently raise his theory of constructive termination, he fails to provide sufficient evidence to survive summary judgment on such a claim. "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks*, 229 F.3d at 930 (quoting *Turner*, 7 Cal. 4th at 1246; *see also Watson v. Nationwide Ins., Co.*, 823 F.2d 360, 361 (9th Cir. 1987) (constructive discharge is found where a working environment is "so intolerable and discriminatory as to justify a reasonable employee's decision [to leave]"). A plaintiff must allege that the discriminatory conduct was severe and pervasive, not just offhand comments or isolated incidents. *See Brooks,* 229 F.3d at 930. "In order to amount to constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Cronk v. Rekitt Benckiser Pharms., Inc*, 2013 WL 4532036, at *2 (N.D. Cal. Aug. 26, 2013) (quoting *Turner*, 7 Cal. 4th at 1251; *see also Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) ("We set the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.").

The standard by which a constructive discharge is determined is an objective one – the question is "whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit." *Turner*, 7 Cal. 4th at 1248 (citation omitted). While the determination of whether working conditions are sufficiently egregious to show constructive discharge is usually a jury question, granting summary judgment is proper if the plaintiff fails to demonstrate that a reasonable trier of fact may find that he was driven from the workplace. *Brooks*, 229 F.3d 917, 930 ("Where a plaintiff fails to

13

1    demonstrate the severe or pervasive harassment necessary to support a hostile work environment

2    claim, it will be impossible for her to meet the higher standard of constructive discharge:

3    conditions so intolerable that a reasonable person would leave the job.").

4          To support of his contention of constructive termination, Plaintiff points to the discussions

5    about moving Plaintiff to another position, his poor performance evaluation in 2019,[1] and the

6    issuance of the performance expectation plan after he complied with the requirements of Ellis'

7    corrective action plan from June 2019. Plaintiff believed that Defendant intended to fire him.

8    This evidence, considered together, is simply insufficient to support a finding by a reasonable fact

9    finder that his working conditions were so egregious that he had no alternative except to quit.

10   Significantly, the Court notes that Plaintiff did not simply resign. Instead, he retired in an effort to

11   retain his retirement benefits and then, when he learned that a possible involuntary termination

12   would not affect his retirement benefits, he sought to return to work. Thus, Plaintiff himself did

13   not appear to believe that his working conditions were intolerable. *See Cronk*, 2013 WL 4532036,

14   at \*2 (finding negative performance review, placing plaintiff on two separate performance

15   improvement plans, questioning plaintiff's commitment, and asking her if she wanted to quit

16   failed to constitute constructive discharge); *see also Boyd v. AutoZone, Inc.*, 2012 WL 4466538

17   (N.D. Cal. Sept. 26, 2012) (finding no constructive discharge where plaintiff was demoted and

18   transferred); *Rochlis*, 19 Cal. App. 4th at 212 ("Criticism of job performance and inadequate

19   compensation, even a demotion or reduction in pay . . ., are not grounds for a constructive

20   discharge."). Therefore, the Court finds that Plaintiff fails to provide evidence sufficient to show

21   that he suffered an adverse employment action through termination or constructive termination.

22             **iii.**    **Failure to Rescind his Retirement.**

23       Plaintiff also argues that Defendant's refusal to rescind his resignation in response to the

24   PEP constitutes an adverse employment action. However, "federal district courts have regularly

25   found in employment discrimination cases brought pursuant to the ADA, Title VII, and related

---

[1] Plaintiff also claims that his failure to receive a $30,000 bonus in 2019 was a substantial reduction in his pay. However, as discussed above, Plaintiff fails show that he was qualified for and entitled to receive a bonus that year.

14

federal and state civil rights statutes . . . that [a]n employer's refusal to allow an employee to rescind his [or her] resignation . . . [is] *not* . . . an adverse employment action." *Featherstone v. S. California Permanente Med. Grp.*, 10 Cal. App. 5th 1150, 1163 (2017) (emphasis in original) (internal quotation marks and citation omitted). As the court in *Featherstone* explained, the reason why "is self-evident: refusing to accept rescission of a resignation is not an adverse employment action for the simple reason that the *employment relationship has ended*." *Id*. (emphasis in original) (internal quotation marks and citation omitted). The *Featherstone* court explained that the plaintiff's attempt to rescind his resignation occurred after the employer accepted the resignation and thus that there was no obligation to accept that rescission. *Id*. at 1166. Here, similarly, Plaintiff attempted to rescind his resignation after Defendant had accepted it. (Dkt. No. 107-5, ¶¶ 7-9.) Therefore, Defendant had no obligation to accept Plaintiff's offer to rescind his retirement and Defendant's rejection of Plaintiff's offer was not an adverse employment action. In the absence of any adverse action, Plaintiff fails to create a question of fact on a claim for employment discrimination.

Even if the refusal to rescind his resignation could constitute an adverse employment action, Plaintiff cannot point to undisputed evidence that similarly situated people outside his protected class were treated in a different manner. Plaintiff points to only two pieces of evidence that other people had been able to rescind their resignation after they announced it and before the date of resignation: a response to a request for admission and his declaration. Plaintiff submits a Request for Admission that asks: "Admit that other employees of [Defendant] were allowed to rescind their announced retirement before the effective date of their retirement." (Dkt. No. 110, Ex. 12 (Request for Admission No. 134).) The response was: "Admitted." (*Id*.) Plaintiff also provides his declaration, in which he states:

> I knew of other employees at [Defendant] who have been allowed to rescind their request for retirement and were able to return to work. Madelynne Farber, a former employee/attorney in the legal department announced her retirement in early 2019, and a short time later changed her mind and decided not to retire and was permitted to resume her job. Gary Sanders was a vice president in 2016 who announced his retirement, later withdrew and returned to his position.

15

(Dkt. No. 111, ¶33.) There is no explanation by Plaintiff of the national origin or race of those two individuals and no explanation if they were on a PEP or whether Defendant had accepted their resignations before the two employees were able to rescind their decisions. In response, Defendant points to undisputed evidence it has never allowed any employee who resigned or retired in response to a PEP to rescind that decision. (Dkt. 107-7 (Declaration of Chris Peters), ¶ 5).) Plaintiff has no evidence to rebut this evidence. (Dkt. 107-2, Ex. G (Hwang Depo. Vol. II) at 197: 14-22.) Thus, Plaintiff cannot show that the two individuals he mentions above were similarly situated to him. Additionally, Plaintiff does not show that the people who were allowed to rescind their resignations were outside his protected class, as he only mentions them by name and title in his declaration. Thus, Plaintiff cannot meet his burden to show that similarly situated people outside his protected class were allowed to rescind their resignations.

Plaintiff also attempts to meet the fourth element by pointing to evidence of direct racial animus: two racially derogatory comments from supervisors. The first comment is one allegedly made by Stephen Younger "to hire no from China." (Dkt. No. 110, Ex. 24 (Deposition of Rebecca Perry) at 76: 7-10, 77:7; Dkt. No. 112 (Declaration of Rebecca Perry), ¶¶ 8-11, Ex. A).)[2] In a session with Perry, another employee of Defendant, Catherine Branda, Ph.D., allegedly reported to Perry that another Director, Anup Singh, reported to her a policy of Younger to "hire no one from China." (Dkt. No. 112, ¶ 10-11.) Branda expressed concern to Perry that Younger's policy regarding Chinese nationals was different from the rigorous standards applied to United States citizens. (*Id*., ¶ 11.)

Younger's alleged statement is triple hearsay and possibly even quadruple hearsay and not admissible. Based on the evidence before the Court, it is not clear exactly what Younger said or to whom he made the statement or explained what the purported policy was. Perry only testified

---

[2] Although Plaintiff alleges that Younger was in the highest position at Defendant and cites to his deposition (Dkt. No. 110, Ex. 13 (Deposition of Steven Younger) at 4:11–15), that testimony only confirms that Younger worked for Defendant from 2017 until the end of 2019. However, for purposes of this argument, the Court accepts that Younger was in the highest position at Defendant.

1   about her notes of a conversation she had with another employee, Branda, who was characterizing

2   what another Director, Singh, reported was a policy dictated by Younger.

3         Plaintiff argues that the final level of hearsay – Perry's notes – are admissible under the

4   business records exception because Perry "maintains notes of [her] interactions with each

5   client[.]" (Dkt. No. 112, ¶ 9.) Under Federal Rule of Evidence 803(6) (the business records

6   exception to hearsay), Perry's notes, but not her deposition testimony describing those notes, are

7   admissible. However, Plaintiff proffers no exceptions for the other levels of hearsay. Although

8   the Court does not focus on admissibility of the form of evidence, Perry's deposition transcript,

9   but rather on the admissibility of its contents, *see Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th

10   Cir. 2003), Perry testified about her notes recounting another person's statements about another

11   person's characterization of another person's policy. Because Perry's notes and deposition

12   testimony regarding Younger's purported policy are not based on her own personal knowledge,

13   her notes and testimony are inadmissible both because they are hearsay and because they not

14   based on personal knowledge. *See Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1091 (9th

15   Cir.1990) ("Like affidavits, deposition testimony that is not based on personal knowledge and is

16   hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand

17   summary judgment"), citing *Jacobsen v. Filler*, 790 F.2d 1362, 1367 (9th Cir. 1986) (deposition

18   testimony about what another told the deponent is not based on personal knowledge and is

19   inadmissible hearsay).

20         The second statement to which Plaintiff points is a statement made by Ellis to Plaintiff that

21   "the fish rots from the head" when she discussed Plaintiff's work. (Dkt. No. 111, ¶11). Hwang

22   believes that was a "racist" comment because "fish is the primary part of the East Asian diet."

23   (*Id.*) Plaintiff cites to an online source, but that source actually states that the origin of the proverb

24   is of unknown origin and possibly originates in Turkey or ancient Greece. (Dkt. No. 108

25   (Plaintiff's Opp.) at 13:27 – 14:6 (citing www.phrases.org.uk).) Moreover, the idea that fish is the

26   staple of the Asian diet is not supported by evidence and is merely Plaintiff's conjecture.[3]

27

28       [3] The idea that Asian food is standardized is also inaccurate, as noted by scholars. *See*, *e.g.*, Naomichi Ishige, The Dietary Culture of Asia, Asia Society,

17

1  Plaintiff's subjective belief that the statement is racist, which he cannot even support with his own
2  source, is not sufficient to raise a triable issue of fact to show racial animus.  Furthermore, one
3  stray comment alone is not sufficient to meet his burden.  *See Merrick v. Farmers Ins. Grp.*, 892
4  F.2d 1434, 1438 (9th Cir. 1990) ("'stray' remarks are insufficient to establish discrimination"); *see*
5  *also Medina v. Multaler, Inc.*, 547 F. Supp. 2d 1099, 1108 (C.D. Cal. 2007) ("'stray comments' . .
6  . do not give rise to triable issues regarding discriminatory intent") (citing *Horn v. Cushman &*
7  *Wakefield Western, Inc.,* 72 Cal. App. 4th 798, 809 (1999) (an isolated, ambiguous remark by a
8  person who did not make the decision to terminate plaintiff, which was not made in the context of
9  plaintiff's termination, was entitled to virtually no weight in determining whether the decision
10 maker harbored discriminatory animus); *Mageno v. Penske Truck Leasing, Inc.,* 213 F.3d 642,
11 2000 WL 300977, *3 (9th Cir. 2000) ("As a 'stray comment' that is unrelated to the decision-
12 making process, [the comment's] probative value falls short of establishing age discrimination");
13 *Turner v. North American Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir. 1992) (where "comments are
14 vague and remote in time and administrative hierarchy, they are no more than stray remarks,
15 which are insufficient to establish discrimination"); *Merrick v. Farmers Ins. Group,* 892 F.2d
16 1434, 1438 (9th Cir. 1990) (stray comments unrelated to the decisional process were not sufficient
17 to raise triable issues concerning the discriminatory nature of a discharge)).
18 　　　　The Court, thus, grants Defendant's motion as to Plaintiff's claims for employment
19 discrimination under Title VII and FEHA.
20 　　　　**2.**　　**Plaintiff's Retaliation Claims.**
21 　　　　Plaintiff contends that Defendant retaliated against Plaintiff by refusing to accept his
22 request to rescind his retirement after Defendant learned that Plaintiff had filed a charge of
23 discrimination with the EEOC.  Plaintiff alleges that he notified Defendant that he had filed the
24 EEOC charge a few hours before Defendant rejected his request to rescind his resignation.  To
25 establish a prima facie case of retaliation, "the employee must establish that: (1) he or she engaged
26 in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link
27
28 https://asiasociety.org/blog/asia/dietary-culture-asia.

18

1  between the two." *Pardi v. Kaiser Foundation Hosp., Inc.,* 389 F.3d 840, 849 (9th Cir. 2004);

2  *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1042 (2005). "Once an employee establishes a

3  prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the

4  adverse employment action." *Yanowitz*, 36 Cal. 4th at 1042. "If the employer produces a

5  legitimate reason for the adverse employment action, the presumption of retaliation "drops out of

6  the picture," and the burden shifts back to the employee to prove intentional retaliation." *Id*.

7        The Court already determined that Defendant's refusal to accept Plaintiff's rescission of

8  his retirement was not an adverse employment action. In the absence of any adverse action,

9  Plaintiff's claims for retaliation fail as a matter of law as well. *See Henneman v. Kitsap Cnty.*,

10  2018 WL 3546804, at *4 (W.D. Wash. July 24, 2018) (Plaintiff's retaliation claim failed because

11  he did not show he was subject to an adverse employment action where he voluntarily resigned

12  and was not constructively discharged), *aff'd by* 783 App'x 723 (9th Cir.).

13        Additionally, even if the Court found that Plaintiff had submitted sufficient evidence to

14  establish a prima facie case of retaliation, Defendant has evidence of a legitimate reason for

15  rejecting Plaintiff's request to rescind his retirement. Defendant rejected Plaintiff's request

16  because his action plan was late and deficient. (Dkt. No. 107-5, ¶¶ 11, 12, Ex. C.) Under the

17  Decision-Making Memo, Plaintiff's deadline to submit a written action plan regarding how he

18  intended to meet the performance expectations in the PEP was December 18, 2019. (Dkt. No.

19  110, Ex. 20.) Plaintiff did not submit his proposed action plan until January 29, 2022. (*Id*., ¶ 10,

20  Ex. B.) The proposed action plan was both late and deficient, as McIlroy found that the action

21  plan did not indicate that Plaintiff accepted responsibility for the management deficiencies which

22  had been identified and conveyed to him. (*Id*.) Plaintiff fails to rebut this evidence and, thus, fails

23  to create a question of fact on intentional retaliation. The Court therefore grants Defendant's

24  motion as to Plaintiff's retaliation claims under Title VII and FEHA.

25  / / /

26  / / /

27  / / /

28  / / /

**CONCLUSION**

For the foregoing reasons, the Court Defendant's motion for summary judgment. The Court will issue a separate judgment. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: August 18, 2022

SALLIE KIM
United States Magistrate Judge